FUSSELL *v.* THE STATE.

1. Merely drawing a pistol in a quarrel, though done by the person who began the quarrel, will not deprive him of the right to use it in self-defence against a deadly attack upon his own life. But drawing the pistol with intent to attack his adversary's life, or under circumstances calculated to excite in the adversary the fears of a reasonable man that an immediate attack on him was intended, would outlaw the right of self-defence in the other. Hence, it was error to charge the jury that if "the defendant began the difficulty, and drew his pistol first, and [his adversary] drew next but shot first, the defendant would not be justified in shooting with intent to kill."

2. The court erred in not granting a new trial on account of the misdirection above pointed out; but no other ground in the motion would require a new trial, though apparently some slight errors were committed.

June 4, 1894.

Indictment for assault to murder. Before Judge HUNT. Irwin superior court. October term, 1893.

E. D. GRAHAM, JACOB WATSON and B. M. FRIZZELL, for plaintiff in error. TOM EASON, solicitor-general, by HINES, SHUBRICK & FELDER and J. H. MARTIN, *contra.*

LUMPKIN, Justice.

According to the evidence, Dorminy and Dixon were seated together in a buggy near a shelter where reli-

gious services were being conducted. Fussell, the accused, approached the buggy and an altercation ensued, in the course of which insulting language was used by both himself and Dorminy. The jury were warranted in finding that Fussell began the quarrel, and that he used the first offensive epithet. As Fussell was coming up to the buggy, Dorminy placed his hand behind his back, as if in the act of drawing a weapon, and while the exchange of opprobrious words was in progress, Fussell drew a pistol, and Dorminy then immediately drew another and began shooting at Fussell, who returned the fire, and each shot several times, resulting in the wounding of both. Indictments for assault with intent to murder were returned against both. Dorminy was tried and acquitted. Afterwards, Fussell was tried and convicted, and his motion for a new trial being overruled, he excepted.

The court, among other things, charged as follows: "If you believe from the evidence that the defendant began the difficulty, and drew his pistol first, and Dorminy drew next but shot first, the defendant would not be justified in shooting with intent to kill." By the words "began the difficulty," taken in connection with the context, the court evidently meant "began the *quarrel*," and by the charge above quoted, and other language used, intended to instruct the jury that if Fussell did begin the quarrel, and was also the first to draw a pistol, Dorminy, without more, was absolutely justified in drawing and shooting at once, and consequently, that his so doing would not justify Fussell in returning the fire, on the idea, as stated in another portion of the charge, that "if Dorminy was justifiable in drawing and shooting, . . . this would be no legal provocation to the defendant to shoot and attempt to kill Dorminy."

This was a very close case, and, in our opinion, the court did not correctly and aptly state the law applica-

ble to the real question upon the determination of which
the guilt or innocence of the accused depended. If, at
the very time of drawing his pistol, Fussell actually in-
tended an attempt to take Dorminy's life, the latter was
justifiable in immediately drawing and using his pistol
in self-defence; or if, when Fussell drew his pistol, his
manner and conduct, and all the attending circumstances,
were calculated to excite in Dorminy the fears of a rea-
sonable man that an immediate deadly attack upon him
was intended, he was likewise justifiable in drawing
and using his pistol for his own protection, whether an
attack upon his life was actually intended by Fussell or
not. In either event, Dorminy would have been justi-
fiable in promptly drawing and using his own pistol.
If he was justifiable in firing at Fussell, the latter could
not return the fire and legally claim to be acting in self-
defence, for, by his own conduct, his right of self-defence
would have been forfeited. On the other hand, if Fus-
sell, in the course of an altercation by words begun by
himself with Dorminy, merely drew his pistol without
at the time intending to make an attack upon Dor-
miny's life, but simply to use the pistol in defending
himself in the event a deadly attack should be made upon
him by Dorminy, and if, after Fussell drew his pistol,
he made no demonstration with it, and there was noth-
ing in his manner or conduct calculated to excite in
Dorminy a reasonable fear that Fussell was about to
shoot him, then Dorminy would not have been justifia-
ble in immediately attempting to shoot and kill Fussell.
The latter, of course, could lawfully defend himself
from a deadly attack which his adversary had no right
to make. So, if Dorminy drew his pistol and shot at
Fussell when there was no real or apparent necessity for
so doing, Fussell's right of self-defence was not cut off.
A provocation by mere words on the part of Fussell
would not have justified Dorminy in drawing and using

a deadly weapon. *Boatwright* v. *The State,* 89 *Ga.* 141.
It is, in the present case, a matter of the greatest
importance to determine why Fussell drew his pistol,
and what he immediately then did. Whether he drew
it to meet a deadly attack about to be made upon him-
self by Dorminy (which attack would not, of course,
have been justified by the mere fact that Fussell had
used offensive language to Dorminy), or for the purpose
of following up his insult to Dorminy with a murderous
attack upon him, is the question upon which the case
should really be made to turn. The court attached too
much importance to the mere fact that Fussell was the
first to draw a pistol. The charge amounted to an in-
struction that if, after beginning the quarrel, Fussell
also drew a pistol, then, *ipso facto,* as matter of law,
Dorminy had a perfect right to draw and shoot. This
conclusion may, or may not, have been correct as mat-
ter of fact. As to this, we express no opinion. But
we do not think it was so absolutely a conclusion of law
as to justify the court in so stating to the jury. It was
a question which should have been left to their deter-
mination. Generally, the drawing of a deadly weapon
by one of two parties between whom an altercation is
going on might be sufficient to justify the other in be-
lieving there was an intent to immediately use it, and in
acting accordingly; and in most cases, a jury under such
circumstances would probably be authorized to find that
an immediate use of the weapon so drawn was intended.
This, however, is not invariably true. It is easy to con-
ceive of a case where two parties might be engaged in a
quarrel, and one of them draw a deadly weapon without
intending to use it at once, or without intending to use it
at all unless it should become necessary to do so for his
own protection. Suppose, in a given case, this should
appear affirmatively and beyond all doubt. Then, cer-
tainly, the other party would not be justified in acting

as he unquestionably would have a right to do were his
adversary manifesting an intent or purpose to use the
weapon he had drawn; and in a case of the kind just
supposed, a charge like that in the present case would
be obviously inappropriate. As every case must stand
upon its own merits, the court should never invade the
province of the jury, but should, in each instance, leave
them to decide whether an emergency, real or apparent,
justifying the use of a deadly weapon, existed. In ar-
riving at a proper conclusion, the jury should take into
consideration all the surrounding circumstances; and
where they are seeking to do right and render a just ver-
dict, they will be very apt to do so. Under the partic-
ular facts of the present case, there are, as we have
above indicated, other elements deserving of considera-
tion besides the mere order of time in which the wea-
pons of the contending parties were respectively drawn
and used. We do not mean to even intimate whether
the jury ought, or ought not, to have concluded that
Dorminy was justified in shooting when he did. We
do mean to say that the court should have left the deter-
mination of this very question to the jury, and not have
undertaken to decide it for them. The vice of the
charge was its failure to leave this question to the jury.

A somewhat similar case is that of *Butler* v. *The State*,
decided at the last term (92 *Ga.* 602), in which it was said
that an instruction to the jury in the following lan-
guage would have been appropriate: "If the assault
upon the accused was made with a weapon likely to
produce death and in a manner apparently dangerous
to life, the fact that the accused provoked the assault
by opprobrious words would not put him in the wrong
for resisting it so far as was necessary to his defence;
and a seeming necessity, if acted on in good faith, would
be equivalent to a real necessity."

In the present case, the charge of the court limited

the law of self-defence, as applicable to Fussell, within lines so narrow that he was deprived of an absolutely fair and impartial trial by jury, as was his right. For this reason, the verdict is set aside.

The motion for a new trial contains many grounds. In so far as the questions presented by them can arise at the next trial, the merits of the case have been substantially covered by what is said above. Some slight errors in addition to the main error already pointed out may have been committed, but none are of sufficient importance to require a discussion of them at our hands, nor would they, of themselves, render the granting of a new trial proper.          *Judgment reversed.*